# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 50
The People &c.,
        Respondent,
    v.
Christopher J. Weber,
        Appellant.

David R. Juergens, for appellant.
Martin P. McCarthy, II, for respondent.

HALLIGAN, J.:

The Appellate Division reversed a County Court order designating defendant Christopher Weber a level three sex offender based on his risk factor point assessment and remitted the matter for consideration of whether an upward departure was warranted (176

- 1 -

AD3d 1631 [4th Dept 2019]).  Defendant contends the remittal was impermissible because the People did not request a departure at the initial hearing before County Court.  We conclude that the Appellate Division had the authority to remit for consideration of an upward departure on the facts presented here.

In 2014, defendant was charged with committing various crimes against a 10-year-old child and pleaded guilty to sexual abuse in the first degree.  Defendant was initially placed on interim probation and promised youthful offender status if he successfully completed one year of probation.  Due to defendant's subsequent arrest on other charges stemming from conduct occurring after his plea, defendant's probation was revoked and he was sentenced to a three-year term of imprisonment.  In accordance with the Sex Offender Registration Act (Correction Law § 168 *et seq.* [SORA]), prior to defendant's release, the Board of Examiners of Sex Offenders assessed defendant 110 points on the risk assessment instrument (RAI), including 10 points under risk factor 1 for the use of forcible compulsion.  Based on this RAI score, the Board deemed defendant a level three sex offender (that is, at a high risk of reoffense) and did not recommend a downward departure.

At his SORA hearing, defendant disputed the points assessed for several risk factors, including those for factor 1 based on forcible compulsion, and requested a downward departure to risk level two.  The People concurred in the Board's point assessment and presumptive level three designation and opposed defendant's departure request.  The People made no request in the alternative for an upward departure in the event the court reduced defendant's RAI points.  County Court rejected defendant's challenges to the

points assessed and adjudicated defendant a level three sexually violent offender. Given the nature of the underlying crime and defendant's record of "serious disciplinary infractions," the court rejected defendant's request for a downward departure from the presumptive level three designation.

Upon defendant's appeal, the Appellate Division reversed and remitted to County Court for further proceedings (176 AD3d at 1631). Noting the People's concession that there was no evidence of forcible compulsion, the Appellate Division reduced defendant's RAI score by 10 points, which rendered him a presumptive risk level two offender (*see id.* at 1632). The Appellate Division concluded that remittal was appropriate because County Court "had no reason to consider" whether clear and convincing evidence supported an upward departure to level three after designating defendant a level three offender based on his RAI score alone (*id.* [internal quotation marks and citation omitted]).

On remittal, defendant moved to preclude the People from seeking an upward departure, arguing that the remittal was improper. County Court permitted the People to pursue a departure and granted defendant's alternative request to limit the proceeding to the record created during the original hearing. At the close of the second hearing, County Court granted an upward departure from level two and again adjudicated defendant a level three sexually violent offender, reasoning that the RAI did not adequately account for defendant's conduct and arrest while he was on interim probation.

The Appellate Division affirmed, noting that "although the People did not request . . . a departure during the original SORA proceeding, there was no reason for them to do so inasmuch as the court had classified defendant as a level three risk based upon the

presumptive risk level yielded by the score on his [RAI]" (195 AD3d 1544, 1544-1545 [4th Dept 2021]). The Appellate Division also rejected defendant's argument that County Court had erred by upwardly departing under the circumstances of this case. We granted defendant leave to appeal (37 NY3d 913 [2021]).

SORA was enacted to protect the public from the danger of sexual recidivism posed by individuals who commit certain sex offenses (*see People v Francis*, 30 NY3d 737, 742 [2018]; L 1995, ch 192, § 1). To that end, "SORA contains a detailed system of registration and community notification, with each sex offender's registration and notification obligations emanating from [their] designated risk level within a three-tiered classification scheme" (*People v Cook*, 29 NY3d 121, 125 [2017]; *see* Correction Law §§ 168-f; 168-h; 168-l; *People v Mingo*, 12 NY3d 563, 570-571 [2009]).

As relevant here, to determine an offender's risk level, the Board provides the court with a risk assessment instrument that assigns numerical values to various risk factors in accordance with the SORA Risk Assessment Guidelines, resulting in an aggregate score that presumptively places an offender in a particular risk level (*see Francis*, 30 NY3d at 743-744; Correction Law § 168-l; SORA Risk Assessment Guidelines and Commentary, at 3 [2006]). At a SORA hearing, the offender and the People may each present evidence in support of their positions regarding the RAI point assessment and the offender's presumptive risk level (*see Francis*, 30 NY3d at 744; Correction Law § 168-n [3]). Each party "may request a departure from the presumptive risk level indicated by the offender's total score" (*Francis*, 30 NY3d at 744; *see* Guidelines at 4), and the court must then determine "whether or not to order a departure from the presumptive risk level indicated

by the offender's [G]uidelines factor score" using the framework set forth in *People v Gillotti* (23 NY3d 841, 861 [2014]).  If the defendant proves by a preponderance of the evidence mitigating circumstances, or the People prove by clear and convincing evidence aggravating circumstances, "of a kind or to a degree not adequately taken into account by the [G]uidelines," the court must then "determine whether the totality of the circumstances warrants a departure [from the presumptive level] to avoid an over- or under-assessment of the defendant's dangerousness and risk of sexual recidivism" (*id.* at 861).

Here, the People prevailed before the SORA court on their requested allocation of points under the RAI and risk level.  When the Appellate Division reversed on the allocation of points and the risk level dropped accordingly, it remitted to allow the SORA court to consider a departure request for the first time.  Defendant and our dissenting colleague object, contending that because this upward departure request was not made during the original SORA proceeding, the SORA court made no ruling "adverse" to the People, and the Appellate Division therefore could not "review" this "unpreserved" departure question and order remittal upon reversal.  But this argument confuses the question of whether remittal was appropriate corrective action with a question of preservation.[1]  This is not a case in which a party failed to present an issue to the SORA

---

[1] Thus, we do not we resolve any broad questions about the scope of the preservation doctrine and its application to "issues" versus "arguments" (*cf.* dissenting op at 5 [emphasis omitted]).  Nor do we address arguments not raised by the parties.  Defendant contends that CPLR 5501 (a) (1) and *Gillotti* precluded the Appellate Division from remitting.  The People dispute these arguments and assert that they were not required to request a departure in the alternative where, as here, they succeeded in obtaining a level three designation

court and then asked the Appellate Division to nonetheless resolve that same question; the

Appellate Division did not rule on the merits of the departure but remitted it for the SORA

court to do so in the first instance.[2]

With respect to whether the remittal was permissible, CPLR 5522 enumerates the

various dispositions that the Appellate Division may order: it may "reverse, affirm, or

modify, wholly or in part, any judgment, or order before it, as to any party," and it may

"render a final determination or, where necessary or proper, remit to another court for

further proceedings" (CPLR 5522 [a]; *see Hecht v City of New York*, 60 NY2d 57, 64

[1983]).  It is true that "neither CPLR 5522 nor any other statutory or constitutional

authority permits an appellate court to exercise any general discretionary power to grant

relief to a nonappealing party" unless necessary to afford full relief to an appealing party

(*Hecht*, 60 NY2d at 63).  But, contrary to our dissenting colleague's conclusion, the

Appellate Division's reversal and remittal for consideration of an upward departure did not

grant the People affirmative relief from County Court's order (*compare Bellevue S. Assoc.

v HRH Const. Corp.*, 78 NY2d 282, 299 n 5 [1991] [affirmance of verdict on alternative

ground would grant affirmative relief where it would require reversal of trial court's rulings

---

through the assessment of points.  Our decision appropriately explains our basis for
rejecting defendant's arguments and for agreeing with the People.

[2]  We therefore need not (and do not) address whether the Appellate Division—which,
unlike this Court, has interest of justice jurisdiction to review unpreserved issues in the
exercise of its discretion (*see Hecker v State of New York*, 20 NY3d 1087, 1087 [2013];
*Elezaj v Carlin Constr. Co.*, 89 NY2d 992, 994-995 [1997]; *Matter of Barbara C.*, 64 NY2d
866, 868 [1985])—could have itself resolved whether a departure was warranted.

and a new trial on claims and theories that had been dismissed by the trial court];

*Tenavision, Inc. v Neuman*, 45 NY2d 145, 151 [1978]), or review any ruling regarding a

departure. County Court adjudicated defendant a level three offender based on an

erroneous RAI point assessment, and the Appellate Division awarded defendant relief by

reversing that order. Its remittal upon that reversal did not "grant greater relief" to the

People than County Court's order (*Tenavision, Inc.*, 45 NY2d at 151); it merely provided,

at most, an opportunity for the People to maintain the relief they originally requested and

obtained before County Court—i.e., a level three designation (*see People v Moss,* 22 NY3d

1094, 1095 [2014]). The People got no "second bite" at the apple, contrary to what the

dissent claims, particularly given that County Court limited the People on remittal to the

record of the initial SORA hearing, and the SORA court made an "appropriate designation"

of defendant's risk level (*Mingo*, 12 NY3d at 568 n 2) based on that original record.

For similar reasons, CPLR 5501 (a) (1) does not control the narrow question before

us. CPLR 5501 (a) (1) is implicated when the final judgment or order has been properly

appealed by the appellant, and the respondent—who was not aggrieved and therefore had

no right to bring a cross-appeal—seeks review of a prior determination that was adverse to

the respondent and would support a judgment in the respondent's favor (*see Parochial Bus*

*Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539, 545-546 [1983]). Here, the Appellate

Division did not review an alternative ground for affirmance under CPLR 5501 (a) (1) on

defendant's appeal from County Court's first order adjudicating him a level three offender.

Rather, the Appellate Division reversed the order of County Court from which defendant's

appeal was taken and, upon that reversal, remitted to County Court for further proceedings to determine whether a departure was warranted in the first instance.

Defendant relies on *People v Gillotti* (23 NY3d 841), *affg sub nom. People v Fazio* (106 AD3d 1291 [3d Dept 2013]), but that decision does not compel a contrary conclusion. There, the RAI proposed by the Board would have designated defendant Fazio a presumptive level one offender; the People asked the SORA court to assess additional points and designate him a level two offender; and the court agreed with the People and adjudicated him a level two offender. Fazio objected to the point allocation and had both reason and opportunity to request that the SORA court grant a downward departure, but did not do so. The Appellate Division upheld the RAI score and level two designation. When Fazio belatedly sought the relief of a downward departure from this Court, we declined to address the argument as unpreserved, while resolving a similar claim that the defendant in the companion case had presented to the SORA court (*see Gillotti*, 23 NY3d at 860-861 & n 5; *see also People v Johnson*, 11 NY3d 416, 421-422 [2008] [observing that no legal issue was presented for this Court's review where the defendant never requested a departure from the SORA court after it rejected his legal arguments disputing the RAI points]). Gillotti and Fazio fared differently because while both had ample reason to request a departure, only one did so.

That same principle applies equally to the People, but the circumstances are different here. Rather than failing to seek a departure after losing on their requested point allocation and risk level before the SORA court, the People prevailed before the SORA court on their requested point assessment and secured their requested level three

designation through the RAI score. Moreover, nothing in our *Gillotti* decision or the decisions below in those cases indicated that the defendant sought remittal, and we did not address the Appellate Division's authority to remit for consideration of a departure request when it reverses an order determining the defendant's risk level.[3]

None of the dissent's strenuous objections persuade us. First, we are skeptical that upholding the Appellate Division's remittal will encourage otherwise avoidable piecemeal litigation or squander judicial resources. When a SORA court assesses sufficient RAI points to assign the risk level sought by the People, the court might go on to adjudicate an academic request for an upward departure (to the same risk level), or it might not.[4] As the People note in their brief, the Appellate Division Departments have remitted in similar circumstances on numerous occasions, including instances in which a departure request had not been made before the SORA court (*see e.g. People v Perez*, 214 AD3d 682, 683

---

[3] Nor, in concluding that defendant's argument was unpreserved for this Court's review, did we address in *Gillotti* the Appellate Division's authority to review an unpreserved departure request in the interest of justice.

[4] The dissent asserts that prosecutors "frequently" seek upward departures in the alternative (dissenting op at 11), but nothing before us establishes what the customary practice is for prosecutors or offenders in SORA hearings. Moreover, most of the cases the dissent cites are not directly apposite; they present instances in which the People did not seek an upward departure in the alternative of their own initiative (*see e.g., Cook*, 29 NY3d at 124 [judge specifically inquired prior to the hearing if People would seek departure in light of defendant's arguments]) or are cases in which the People sought—through either a point assessment or, alternatively, an upward departure—a different risk level than that recommended by the Board's RAI. In such circumstances, the People plainly had reason to request in advance of the hearing an upward departure in the alternative to their requested points, unlike here, where the People sought the same risk level as the Board's RAI and prevailed on that point assessment at the hearing.

[2d Dept 2023] [remitting where the record "reflect(ed) that the People would have sought an upward departure had the Supreme Court not designated the defendant a level three sexually violent offender"]; *People v Lewis*, 178 AD3d 971, 972-973 [2d Dept 2019] [remitting where neither party requested a departure before the SORA court but the "erroneous assessment of . . . points . . . may have impacted the People's decision to refrain from seeking an upward departure"]; *People v Brown*, 148 AD3d 1705, 1707 [4th Dept 2017] [remitting for further proceedings regarding whether to depart upon removal of improperly assessed risk factor points]; *People v Felice*, 100 AD3d 609, 610 [2d Dept 2012] [remitting where the record "indicate[d] that the People would have sought an upward departure"]; *People v Munafo*, 119 AD3d 1102, 1103 [3d Dept 2014] [remitting because SORA court "did not have the opportunity to consider whether an upward modification was warranted" due to its presumptive risk level classification]; *People v Swain*, 46 AD3d 1157, 1159 [3d Dept 2007] [remitting where "the record contains some evidence that an upward departure from the presumptive level may be warranted" and SORA court "had no reason to consider whether" to depart]).[5]

Second, our ruling today does not portend an avulsive change in the rules of civil practice. Needless to say, we do not address the extent of the Appellate Division's remittal authority in a broad array of contexts not before us in this appeal. SORA is a unique and

_____

[5] To the extent the dissent suggests that parties will struggle to apply our ruling in other circumstances—for example, where a court reserves judgment and later sends out a written order—we underscore the specific posture here: the SORA court agreed to the point allocation and risk level requested by the party who later sought remittal following reversal on appeal.

detailed statutory scheme that delegates to the Board responsibility for "develop[ing] guidelines and procedures to assess the risk of a repeat offense by such sex offender and the threat posed to the public safety" (Correction Law § 168-l [5], [6]). The procedures established by the Board dictate that the court first determine the presumptive risk level based upon the point assessment it deems appropriate under the Guidelines, and the court may then depart from that level "if it concludes the factors in the RAI do not result in an appropriate designation" (*Mingo*, 12 NY3d at 568 n 2; *see* Guidelines at 4; *Gillotti*, 23 NY3d at 853; *Johnson*, 11 NY3d at 421; *People v Talluto*, 39 NY3d 306, 315 [2022] [SORA court's "authority" to depart and "the procedures for assessing the defendant's presumptive risk level in the first instance, are derived from SORA's (G)uidelines"]; Correction Law § 168-n [2] [directing the courts to determine offender risk level by "applying the guidelines"]). Given the sequential structure of the departure process—a point we have repeatedly recognized (*see Gillotti,* 23 NY3d at 853; *Johnson*, 11 NY3d at 421)—a SORA court cannot assess a departure request until an offender's presumptive risk level has been determined.[6]

---

[6] Despite the dissent's dubious suggestion that departures can be undertaken by the SORA court without regard to the RAI point assessment (dissenting op at 10), both the Guidelines and our jurisprudence make clear that the presumptive risk level is first determined through application of the Guidelines and the RAI—whether through allocation of points or a presumptive override to level three—and is the starting point for the departure analysis (*see People v Wolm*, 209 AD3d 682, 683 [2d Dept 2022] [observing that courts must determine whether to depart "from the presumptive risk level" and that "(r)egardless of whether the presumptive risk level has been determined by the assessment of points or the application of an override," the departure analysis remains the same], *lv denied* 39 NY3d 909 [2023]).

Third, we are unconvinced that the remittal here was inconsistent with *People v Havelka* (45 NY2d 636 [1978]) and progeny.  In *Havelka*, we reaffirmed the well-settled principle that a rehearing should be ordered where an "error of law" by the hearing court resulted in a less than "full opportunity" for the People to address what could otherwise be a dispositive issue at the original hearing (*id.* at 643; *see e.g. People v Crandall*, 69 NY2d 459, 463 [1987] [remittal appropriate where, in reliance on the court's holding that the search was proper pursuant to a search warrant, the People "had no incentive" to pursue an alternative ground for sustaining the search]).  Even if our case law regarding criminal proceedings was apposite here despite resting on different rights and rules of procedure, our holding today is consistent with *Havelka*, in which "there was no erroneous ruling by the [nisi prius] court to lull the People into complacency" (*Crandall*, 69 NY2d at 464; *People v Payton*, 51 NY2d 169, 176-177 [1980] [the People "should not be penalized for (their) initial success at the hearing" and their alternative theory could be raised at new hearing because it was not "relevant and necessary to the People's case" until reversal on appeal]).[7]

In the absence of any applicable statutory or other jurisdictional limitation on the Appellate Division's authority, we decline defendant's invitation to restrain the Appellate

---

[7] The dissent relies on cases involving post-conviction proceedings (*see e.g. Banister v Davis*, 590 US ___, ___, 140 S Ct 1698, 1703 [2020]; *People v Tiger*, 32 NY3d 91, 93 [2018]; *People v Jackson*, 78 NY2d 638, 647 [1991]).  But as we have explained in response to prior dissents, "post-conviction motions . . . [and] motions to set aside sentences are subject to different statutory limitations and implicate different interests" than direct appeals (*People v Kaval*, 39 NY3d 1081, 1083-1084 [2022]).

Division from remitting in these circumstances. "[T]he ultimate and 'paramount concern' of the SORA risk-level assessment is 'an accurate determination of the risk a sex offender poses to the public'" (*People v Perez*, 35 NY3d 85, 94 [2020], quoting *Mingo*, 12 NY3d at 574). Both that concern and the substantial consequences that a SORA classification carries for a defendant underscore the importance of ensuring that the courts correctly assess the risk that an offender poses to the community in making a risk level determination (*see* Correction Law §§ 168-d [3]; 168-n [2]; *Johnson*, 11 NY3d at 421). Curbing the Appellate Division's power to remit for consideration of departure requests when it disagrees with the hearing court's point assessment and changes an offender's presumptive risk level would undermine SORA's objective and unduly constrain the Appellate Division's authority to order appropriate remedial action.

Accordingly, the Appellate Division order appealed from and the Appellate Division order brought up for review should be affirmed, without costs.

WILSON, Chief Judge (dissenting):

Our adversarial system is premised on the idea that interested parties will bring all the issues they wish to have a court consider, thus allowing courts to make the most informed decision in each case. Counsel can choose to advance a kitchen sink of arguments, carefully choose a more limited set, or carelessly omit a potentially strong argument. Because our courts rely on the diligence and judgment of counsel in the presentation of issues for decision, the consequence for parties whose counsel fails to

advance a meritorious claim are high, regardless of whether the failure arose from a clever strategy or a grotesque bungle. Other than when counsel's negligence is so substantial as to violate the constitutional right of a criminal defendant to effective assistance of counsel, litigants are barred from belatedly advancing claims they had a full and fair opportunity to raise initially. Civil litigants have no such relief under our established precedent (other than by a separate claim for legal malpractice).

In this case, the People sought a level-three determination, based on the cumulation of points under the SORA Guidelines, which in turn depended on their position that "forcible compulsion" could refer to "social, emotional et cetera kind of forces." They could have sought upward departure in the alternative, but chose not to do so. A quick skim of the three authoritative paragraphs on the subject would have revealed that the People's sole claim was meritless (*see* Sex Offender Registration Act Risk Assessment Guidelines and Commentary at 8 [2006] [Guidelines]). On appeal the People realized their argument was indefensible and—to their credit—withdrew it, conceding the entire issue. Having conceded their loss on the only claim they had advanced, the People asked the Appellate Division to grant them a do-over. Although civil litigants in this circumstance never get a do-over, the Appellate Division granted them one, which the majority condones.

The majority and I agree that the People did not ask for an upward departure and that their subsequent upward departure request was unpreserved. We part ways where the majority carves out a new preservation workaround: instead of "rul[ing] on the merits," the

court may instead "remit[]" the case for the trial court to address the argument "in the first instance" (majority op at 6), *i.e.*, a do-over. However this idea is dressed up, the fact is that the People did not seek an upward departure when they could have, on appeal lost the issue they had raised below, and were given a chance to go back and raise the omitted argument. Neither civil nor criminal litigants are afforded such an opportunity.

The majority further rests its holding on the proposition that although the rules of procedure do not authorize appellate courts to grant relief to a nonappealing party (here, the People), "the Appellate Division's reversal and remittal for consideration of an upward departure did not grant the People affirmative relief from County Court's order" (majority op at 6). The opportunity for a do-over, to raise an argument you could have raised but did not, is plainly affirmative relief; it unquestionably benefitted the People here.

But according to the majority, its decision changes nothing about our normal civil procedure. Of course, the statute providing remittal authority, CPLR 5522 (a), applies equally to the Court of Appeals as it does to the Appellate Division. The majority's workaround therefore raises the question of why we have, for decades, dismissed "substantial constitutional question[s]" on the ground that they are unpreserved, instead of remitting those cases so that the court of instance can properly preserve them (*see e.g.*, *Henry v New Jersey Transit Corp.*, — NY3d —, 2023 NY Slip Op 01466, at *4 [2023]; *Matter of Schulz v State of New York*, 81 NY2d 336, 344 [1993]; *Matter of Shannon B.*, 70 NY2d 458, 462 [1987]).

In reality, the majority carves an indeterminately sized hole in our procedural rules. Future civil litigants will assert equal rights to do-overs. A future defendant failing to contend that she did not breach a duty of care may, consistently with the majority's opinion, obtain a do-over to raise that argument, point out that until an appellate court rules that she had a duty, the court "cannot assess" a breach claim (*see* majority op at 11). A future plaintiff who fails to plead a cause of action for fraud may likewise claim entitlement to a do-over because, until an appellate court rules that the plaintiff had no contract with the defendant, the necessary prerequisite to his fraud claim (absence of an enforceable contract) was lacking. The majority "do[es] not address the extent of the Appellate Division's remittal authority" (*id*. at 10), leaving the question open for future litigation.

To cabin its holding, the majority first tries to distinguish this case from other civil litigation by saying that SORA, although admittedly "subject to the civil appeals process" (*People v Buyund*, 37 NY3d 532, 540 [2021]), is not really civil because of the public safety risks and "substantial consequences that a SORA classification carries for a defendant" (majority op at 13). However, in the criminal context—where the public safety risks and due process considerations are often much greater—prosecutors are flatly prevented from getting do-overs to add theories of liability they could have raised in a hearing or added to an indictment. When faced with this unfavorable comparison, the majority correctly disregards criminal precedent in part because it "rest[s] on different . . . rules of procedure" (*id*. at 12). Neither fully civil nor fully criminal, SORA has a foot in both worlds and is therefore, according to the majority, governed by the rules of neither.

Unable to find precedent in civil or criminal practice, the majority instead turns to SORA exceptionalism, saying that "SORA is a unique and detailed statutory scheme" governed by "procedures established by the Board" in the SORA Guidelines (majority op at 10-11). But neither the Guidelines nor our SORA precedents bless the majority's procedural innovations. When confronted with the myriad ways this case is inconsistent with our SORA precedent and SORA practice by which prosecutors often seek upward departures in the alternative and courts adjudicate the merits of those requests independently the presumptive risk-level, the majority either creates new rules justified by no precedent, walks back its argument that parties do not need to plead departures in the alternative (*see* majority op at 10 n 5), or simply denies the existence of the practice altogether (*see* majority op at 11 n 6).

## I.

I firmly agree with one proposition on which the majority opinion rests: our preservation doctrine concerns the preservation of *issues*, not arguments.

If the majority restricted itself to arguments preserved by the People, the People would unquestionably lose. Not only did the People fail to request an upward departure in Mr. Weber's SORA hearing, but neither the People's briefs nor arguments on remand to County Court, in the Appellate Division, or even on this appeal to our Court contain the arguments on which the majority has decided this appeal. The People never mentioned that *Gillotti* does not control here because Mr. Fazio "had ample reason to request a departure" but failed to do so (majority op at 8), and never claimed that the Appellate

Division's remittal "did not grant the People affirmative relief from County Court's order" (majority op at 6). The majority explicitly rejects the People's only proposed source of authority for the Appellate Division's remittal, CPLR 5522 (a). The People's only response to Mr. Weber's argument that the Appellate Division could not grant them affirmative relief because they were a nonappealing party was that CPLR 5501 (a) (1) does not limit the relief authorized by CPLR 5522 (a), an argument the majority squarely rejects (*see* majority op at 6 ["neither CPLR 5522 nor any other statutory or constitutional authority permits an appellate court to . . . grant relief to a nonappealing party . . . ." (internal quotation marks omitted)]). Although the majority explicitly disavows that it is engaged in issue preservation (*see* majority op at 5 n 1), there is no way for it to reach its holding using only arguments preserved and raised by the litigants.[1]

## II.

---

[1] Sometimes we use the imprecise turn of phrase that "arguments" must be preserved (*see e.g.*, *Henry*, — NY3d —, 2023 NY Slip Op 01466, at \*5; *Maldovan v County of Erie*, 39 NY3d 166, 171 [2022]); *Batavia Townhouses, Ltd. v Council of Churches Hous. Dev. Fund Co., Inc.*, 38 NY3d 467, 474 n 2 [2022]). However, "appellate judges . . . do not sit as automatons" merely to register their reactions to the arguments which counsel make below (*Misicki v Caradonna*, 12 NY3d 511, 519 [2009] [internal quotation marks omitted]; *see also* Arthur Karger, Powers of the New York Court of Appeals § 17:1 [3d ed rev, Aug. 2022 update]). Rather, "we are confined to the *questions* raised or argued at the trial, but not to the arguments there presented" (*Persky v Bank of America Nat. Assn.*, 261 NY 212, 218 [1933], citing *Oneida Bank v Ontario Bank*, 21 NY 490, 504 [1860] [emphasis added]). We hamstring our ability to resolve complicated questions of law when we limit ourselves solely to the exact arguments advanced by the parties (*see People v Epakchi*, 37 NY3d 39, 63-64 [2021, Wilson, J., dissenting]; *Kosmider v Whitney*, 34 NY3d 48, 80-82 [2019, Wilson, J., dissenting]). Recognizing the limits of argument preservation, we have in the past opted for issue preservation instead (*see e.g.*, *People v Sanders*, 39 NY3d 216, 220 n \* [2023]; *Aurora Associates LLC v Locatelli*, 38 NY3d 112, 145 [2022, Wilson, J., dissenting]); this case continues that trend.

The majority has created a procedural jackalope to evade the normal rules of civil practice. Normally, remitting for reargument on a theory of liability not raised below would not be "necessary or proper" (CPLR 5522 [a]). According to the majority, however, the public safety concerns and the "substantial consequences" for defendants (majority op at 13) place a premium on accuracy that exempts SORA from our normal civil procedural rules. But in the criminal context—where even greater public safety and due process concerns apply—we do not allow the Appellate Division to reopen cases so that the People can advance a new theory. Evidently SORA is not criminal either. As envisioned by the majority, SORA is a hybrid of criminal and civil procedure that is ungoverned by either set of procedural rules.

### A.

The majority's decision raises serious questions about what litigants must do to ensure their issues receive appellate review. Its justification that "court cannot assess a departure request until an offender's presumptive risk level has been determined" (majority op at 11) equally applies to a plaintiff's factually and legally inconsistent pleadings, or mutually exclusive remedies. A court cannot, for instance, hold that a contract was fraudulently induced and also that the defendant breached it; nor can the court void the contract while also granting damages for its breach. Yet we permit (*e.g. Cohn v Lionel Corp.*, 21 NY2d 559, 563 [1968]) and even expect plaintiffs to raise all claims and requests in the same pleading, and deem alternatives forfeited when they arise from the same

transactions or occurrences. The majority offers no basis from either the statutory scheme or our prior caselaw for why SORA would be an exception to this rule.

"Increasingly, modern practice [in civil litigation] has placed a premium on the policies . . . of efficiency, finality, and judicial economy" (*Paramount Pictures Corp. v Allianz Risk Transfer AG*, 31 NY3d 64, 75 [2018]). In civil litigation, it is axiomatic that a plaintiff's failure to raise an alternative cause of action arising from the same transaction or occurrence forfeits that claim (*see e.g.*, *People v Wakefield*, 38 NY3d 367, 386 [2022]; *Vista Engineering Corp. v Everest Indemnity Insurance Co.*, 161 AD3d 596, 598 [1st Dept 2018] ["It is well settled that a party may not argue on appeal a theory never presented to the court of original jurisdiction"]; *Lobello v New York Cent. Mut. Fire Ins. Co.*, 112 AD3d 1287, 1287-1288 [4th Dept 2013]; *Pekich v Lawrence*, 38 AD3d 632, 633 [2d Dept 2007]; *Howe v Village of Trumansburg*, 199 AD2d 749, 751-752 [3d Dept 1993], *lv denied* 83 NY2d 753 [1994]; *Lucky Brand Dungarees, Inc. v Marcel Fashions Group, Inc.*, 590 US —, —, 140 S Ct 1589, 1594-1595 [2020]). Litigants are permitted and even expected to seek inconsistent remedies in the same pleading at the risk of forfeiting those claims (*see* CPLR 3002; *O'Brien v City of Syracuse*, 54 NY2d 353, 357 [1981]; *I.N.S. v Doherty*, 502 US 314, 328-329 [1992]). Although that procedure can be harsh and in tension with the truth-seeking function of our judicial system, it vindicates vital interests of finality and judicial economy (*cf. Paramount Pictures Corp.*, 31 NY3d at 73; *Brown v Felson*, 442 US 127, 131 [1979]).

Even in the criminal context, where the imperatives of public safety and due process are at their zenith, we often prioritize finality over accuracy (*see Kevin W.*, 22 NY3d 287,

296 [2013]; *People v Jackson*, 78 NY2d 638, 647 [1991]).  As we explained in *People v Havelka* (45 NY2d 636, 643 [1978]), our legal system "offers a single opportunity for the presentation and resolution of factual questions. If such a practice were not followed, the defendant, having prevailed at the hearing, would be haunted by the specter of renewed proceedings."  More generally, it is well-established that the prosecution may have "one full opportunity" to raise its arguments in support of a position, regardless of interest of justice jurisdiction (*cf. People v Giles*, 73 NY3d 666, 671 [1989]; *People v Crandall*, 69 NY2d 459, 464-465 [1987]; *People v Payton*, 51 NY2d 169, 177 [1980]; *Burks v US*, 437 US 1, 17 [1978] [the government may not have a "second bite at the apple" where a defendant is entitled to acquittal]; *Corbin v Hillery*, 74 NY2d 279, 291 [1989]; *People v LaFontaine*, 92 NY2d 470, 474-475 [1998]).  Trial courts are no exception from this rule, and may not reopen proceedings to give the People another try at a legal theory they neglected to raise when given the chance (*see Kevin W.*, 22 NY3d at 289).  Here, the People were not "lull[ed] . . . into complacency" (*Crandall*, 69 NY2d at 464) by the SORA court's erroneous ruling because their position was laid out in advance of the hearing.

## **B.**

The majority justifies its departure from settled procedure with three arguments: that that the SORA Guidelines prevent a court from adjudicating a departure request until it has calculated a point total; that requiring prosecutors to make such a request would have no efficiency benefits; and that accuracy in the SORA context is too important to sacrifice for judicial economy.  Those arguments are inconsistent with the realities of civil practice in general and SORA practice specifically.

Nothing in the Guidelines lays out a "sequential structure of the departure process" that would govern appellate procedure (majority op at 11) nor does the regular practice of SORA courts and litigants suggest that SORA would have different pleading requirements than civil litigation in general. The cited portion of the Guidelines does not say that a court must "*first* determine the presumptive risk level based upon the point assessment . . . and . . . *then*" determine the departure (*see* majority op at 11 [emphasis added], citing, *inter alia*, Guidelines at 4). Instead, the relevant section of the Guidelines simply says that a court may not depart from the presumptive risk score "unless it concludes that there exists an aggravating or mitigating factor . . . that is not otherwise adequately taken into account by the guidelines" (Guidelines at 4). The Guidelines and our jurisprudence allow a court to say that a factor not taken into consideration by the Guidelines warrants a level-three designation regardless of the point total. The determinations are often independent of one another. For instance, in this case, the basis of the People's upward departure request had nothing to do with their losing point argument for Factor 1 (the definition of forcible compulsion) and instead turned on whether some of Mr. Weber's conduct during confinement was a different kind of conduct than that captured by the point assessments under Factor 13. Conceptually speaking, it is no more incoherent to depart from an uncertain point total than it is to automatically override an uncertain point total (*see* Guidelines at 3-4), yet lower courts do so often and the majority explicitly blesses this practice (*see People v Wolm*, 209 AD3d 682, 683 [2d Dept 2022] ["In light of our determination that an override was established, we need not reach the defendant's challenge to the assessment of points . . . ."], *lv denied* 39 NY3d 909 [2023]; majority op at 11 n 6).

But even if one read the Guidelines to require a court to make a point determination first and then consider an upward departure, that requirement would not support remittals to obtain a final point-level determination before any upward departure or alternative risk-level determination could be considered.  Instead, such a requirement would support the usual practice of asking the SORA court for any applicable risk-level determination in the alternative.  With all the relevant arguments in hand, the court could issue a single opinion that first determined points and then adjudicated departures.

In practice, prosecutors frequently seek upward departures in the alternative (*see e.g.*, *People v Cook*, 39 NY3d 121, 124 [2017]; *People v Manley*, 209 AD3d 445 [1st Dept 2022], *lv denied* 39 NY3d 909 [2023]; *People v Bonds*, 207 AD3d 666 [2d Dept 2022], *lv denied* 39 NY3d 903 [2023]; *People v Edmee*, 205 AD3d 938 [2d Dept 2022], *lv denied* 39 NY3d 901 [2023]; *People v Myles*, 202 AD3d 549 [1st Dept 2022], *lv denied* 38 NY3d 910 [2022]; *People v Correa*, 202 AD3d 413 [1st Dept 2022], *lv denied* 38 NY3d 909 [2022]; *People v Satornino*, 200 AD3d 813 [2d Dept 2021], *lv denied* 38 NY3d 908 [2022]; *People v June*, 195 AD3d 1443 [4th Dept 2021], *lv denied* 37 NY3d 912 [2021]; *People v Green*, 192 AD3d 927 [2d Dept 2021], *lv denied* 37 NY3d 910 [2021]; *People v Garcia*, 192 AD3d 833 [2d Dept 2021], *lv denied* 37 NY3d 910 [2021]; *People v West*, 189 AD3d 1481[2d Dept 2020], *lv denied* 36 NY3d 913 [2021]; *People v Pierre*, 189 AD3d 1092 [2d Dept 2020], *lv denied* 36 NY3d 912 [2021]; *People v Malena*, 186 AD3d 1175 [1st Dept 2020], *lv denied* 36 NY3d 907 [2021]; *People v Larkin*, 66 AD3d 592 [1st Dept 2009], *lv*

*denied* 14 NY3d 704 [2010]; *People v Ross*, 37 AD3d 1117 [4th Dept 2007], *lv denied* 9 NY3d 802 [2007]).[2]

Courts regularly adjudicate departure requests independently of the underlying point total. Sometimes, the adjudication takes the form of alternative holdings, which necessarily assess the merits of the departure regardless of how one comes out on the point issue (*People v Havens*, 144 AD3d 1632, 1633 [4th Dept 2016], *lv denied* 29 NY3d 901 [2017]; *People v Montes*, 134 AD3d 1083, 1083-1084 [2d Dept 2015], *lv denied* 27 NY3d 904 [2015]). Other times, courts refuse to adjudicate point totals altogether, recognizing that they do not need to analyze the point and departure issues in any particular order (*see e.g.*, *People v Jones*, 114 AD3d 550, 551 [1st Dept 2014] ["Regardless of whether points should have been assessed under factor 1 for defendant's use of 'forcible compulsion' . . . the record supports the court's alternate finding that a discretionary upward departure to level three was warranted under the circumstances"], *lv denied* 23 NY3d 903 [2014]; *People v Newman*, 71 AD3d 488, 488 [1st Dept 2010] ["Regardless of whether defendant's correct point score would make him a presumptive risk level one or two offender, a discretionary upward departure to level three is warranted by aggravating factors"]). Much as a court can determine that there has been no breach of an alleged duty without deciding

---

[2] The majority explains that most of these cited cases are "not directly apposite" because they present instances in which the People "plainly had reason" to request a departure in the alternative because their assessment differed from the Board's RAI (majority op at 9 n 4). That distinction is irrelevant to the question of whether the People must make their backup argument in advance of the trial court's point determination. If a defendant has challenged a level based on points – whether the People and Board agree on the points – the defendant might prevail. That possibility should require the People to advance any other theory they may have that would justify the risk level they seek.

whether the defendant had a duty to the plaintiff, a SORA court can determine that, for instance, there is a non-points factor warranting a level-three designation regardless of how it comes out on a particular point calculation.

The majority is "skeptical" that the rules we deploy in civil and criminal cases—on the basis of their efficiency-enhancing functions—would have the same result in SORA cases because trial courts "might not" adjudicate an academic request for an upward departure (majority op at 9). Of course, courts in all other kinds of civil cases may refuse to adjudicate alternative claims as well (*see e.g.*, *Nostram v A.W. Chesterton Co.*, 15 NY3d 502, 509 [2010]; *Wittlinger v Wing*, 99 NY2d 425, 433 [2003]; *Restrepo v State*, 179 AD2d 804, 804 [2d Dept 1992]; *Effective Communications West, Inc. v Board of Co-op. Educ. Servs. of Sole Supervisory Dist. of Cattaraugus, Erie and Wyoming Counties*, 57 AD2d 485, 491 [4th Dept 1977]). On the other hand, civil courts—including SORA courts— often make alternate holdings to avoid inefficient remands (*see e.g.*, *People v Shaw*, 204 AD3d 617, 617 [1st Dept 2022]; *U.S. Bank National Association v Gordon*, 158 AD3d 832, 837 [2d Dept 2018]; *People v Varin*, 158 AD3d 1311, 1311 [4th Dept 2018], *lv denied* 31 NY3d 905 [2018]; *Havens*, 144 AD3d at 1633). The point of requiring litigants to file all their claims at once is that the alternative grounds will often not be academic and courts can avoid needless proceedings (*see e.g.*, *People v Songster*, 207 AD3d 579, 582 [2d Dept 2022], *lv denied* 39 NY3d 904 [2022]; *People v Cortez-Moreno*, 215 AD3d 698, 699 [2d Dept 2023]).

Nothing about the underlying equities in the SORA context suggests that we should depart from common practice. The majority justifies SORA exceptionalism by stating that

the "ultimate and 'paramount concern' of the SORA risk-level assessment is 'an accurate determination of the risk a sex offender poses to the public' " (majority op at 13, quoting *People v Perez*, 35 NY3d 85, 94 [2020]).  One could make an even stronger case for the paramount concern of a correct result in murder trials (*see e.g. People v Wilkins*, 65 NY2d 172, 180 [1985]; *People v Knapp*, 57 NY2d 161, 175 [1982]; *People v Travis*, 162 AD2d 807, 810 [3d Dept 1990]) or cases of wrongful imprisonment (*see e.g. People v Tiger*, 32 NY3d 91, 101 [2018] [refusing to allow a defendant to challenge her wrongful conviction in part because of the importance of "conserving judicial resources and providing finality in criminal proceedings"]).[3]  It is not clear why the People should be forgiven for failing to request an upward departure, especially when wrongfully confined sex offenders and victims of sexual assault are not afforded the same luxury (*see e.g.*, *Michael M. v Cummiskey*, 178 AD3d 1457, 1458 [4th Dept 2019]; *Howe* 199 AD2d at 751-752 [denying recovery to a victim—after she was sexually assaulted by a village police officer abusing his official authority—because she only asserted negligent hiring and 42 USC § 1983 claims below and not vicarious liability]).

---

[3] *People v Kaval* does not "explain[]" anything about how or why we strike the balance we do in these cases (*see* majority op at 12 n 7).  It simply asserts that two different type of criminal procedural vehicles for postconviction relief are subject to different statutory structures and "implicate different [unspecified] interests" (*People v Kaval*, 39 NY3d 1081, 1084 [2022]).  I agree that the interest calculus for wrongful convictions and murder trials is different than the interest calculus for SORA sentences.  The relative importance of accuracy is higher in the former, but persons wrongfully convicted because they failed to raise a potentially meritorious argument are not afforded the free do-over the majority grants here.

Putting aside the implications of its statement, the majority's characterization of SORA is inconsistent with SORA practice and jurisprudence. To start, we apply the *Havelka* line of cases to future SORA defendants when we criminally prosecute them for the underlying sex offenses that will trigger the SORA inquiry (*see e.g.*, *People v Bouton*, 50 NY2d 130, 136 [1980]); it is not clear why we would care more about accuracy in determining someone's SORA risk level than we would in deciding whether or not the defendant qualifies for SORA at all, let alone whether a defendant qualifies for years of incarceration.

But even in the SORA context, we limit judicial review in the interest of finality and judicial economy, often at the expense of accuracy. In regularly applying our preservation doctrine to requests for downward departures, for instance, we implicitly prioritize efficiency over accuracy in SORA proceedings (*see e.g. Gillotti*, 23 NY3d at 861 n 5; *People v Johnson*, 11 NY3d 416, 418-421 [2008]; *see also People v Jackson*, 29 NY3d 18, 22 [2017] ["the (preservation) requirement is grounded in large part in the need to preserve limited judicial resources and avoid untoward delay in the resolution of . . . proceedings" (internal quotation marks omitted)]). We have refused to allow a defendant to employ the illegal sentence exception in the SORA context because doing so would be "impractical and unworkable" (*see Buyund*, 37 NY3d at 540). In this case, however, we decline to enforce our preservation doctrine because accuracy is too important.

## III.

The Appellate Division's remittal also failed to comport with a basic rule of appellate procedure. Although it may have broad authority to act within its scope of

review, the Appellate Division may not exceed its jurisdiction.  It has jurisdiction to

"*review* questions of law and questions of fact on an appeal from a[n] . . . order of a court

of original instance" (emphasis added).  It may remit when "necessary or proper" (CPLR

5520 [a]), for instance to return a factual question to a jury (*Imbrey v Prudential Ins. Co.*,

286 NY 434, 441 [1941]) or supplement a record that is so unclear as to be unreviewable

(*Matter of Emray Realty Corp. v Abrams*, 309 NY 888, 889 [1955]).  It may not remit a

case to allow a non-appealing party to raise an entirely new claim

      "[A]n appellate court's scope of review with respect to an appellant . . . is generally

limited to those parts of the judgment that have been appealed and that aggrieve the

appealing party" (*Hecht v City of New York*, 60 NY2d 57, 61 [1983]).  "Generally, the party

who has successfully obtained a judgment or order in his favor is not aggrieved by it, and,

consequently, has no . . . right to appeal" (*Parochial Bus Sys. v Board of Educ. of City of

New York*, 60 NY2d 539, 544 [1983]; *see also* CPLR 5511).  We regularly refuse even to

consider appeals by parties who are not properly aggrieved by the orders from which they

appeal (*see e.g.*, *Wu v Sabrina Balsky Interior Designs*, 39 NY3d 960, 961 [2022]; *Matter

of Tariq S. v Ashlee B.*, 38 NY3d 1167, 1167 [2022]).

      CPLR 5501 (a) (1) explicitly recognizes a limit on this otherwise harsh jurisdictional

principle by allowing a fully successful respondent—who would otherwise be barred from

appealing and getting relief—to bring up for review certain non-final judgments or orders

"which w[ere] adverse to the respondent on appeal from the final judgment and which, if

reversed, would entitle the respondent to prevail in whole or in part on that appeal."  As

we explained in *Parochial Bus Sys.*, "[t]his rule permits a respondent to obtain review of a

determination incorrectly rendered below where, otherwise, he might suffer a reversal of the final judgment or order upon some other ground" (60 NY2d at 545-546).

Because CPLR 5501 (a) (1) defines the scope of appellate court review as relevant in this case, it necessarily sets the contours of relief an appellate court may order. We considered the issue most directly in *Hecht*, when we said that "CPLR 5522 . . . should be read in harmony with the statutory scheme which limits an appellate court's authority to the grant of relief to those who have appealed" with limited exceptions (60 NY2d at 64). CPLR 5522 does not permit the Appellate Division to exceed the scope of its review. Granting "affirmative relief to a nonappealing party" typically expands the scope of appellate review and is therefore impermissible (*see Hain v Jamison*, 28 NY3d 524, 534 n 3 [2016]; *DiMichel v South Buffalo Ry. Co.*, 80 NY2d 184, 192 [1992]).

In this case, the People had no adverse determination from which to appeal. County Court granted the People all the relief they sought. Thus, neither CPLR 5501 (a) (1) nor CPLR 5522 (a) could help them. Had the People asked the SORA court for an upward departure in the alternative, it might have dismissed the request as academic based on the points determination and the People would have an adverse determination that would have been brought up for review by CPLR 5501 (a) (1) (*see e.g. Larkin*, 66 AD3d at 593). They declined to make any such request and the Appellate Division was therefore without power to grant them the affirmative relief of a new hearing (*see Bellevue S. Assoc. v HRH Const. Corp.*, 78 NY2d 282, 299 n 5 [1991] ["Plaintiff asks that the verdict . . . be affirmed on an alternative ground . . . . (P)laintiff's present requests, which if meritorious would require reversal of the trial court's rulings and a new trial, go beyond the affirmance of the

judgment and cannot be awarded to a nonappealing party"]). The majority's holding renders a portion of CPLR 5501 (a) (1) superfluous: the rule requires the existence of an erroneously rendered nonfinal judgment to save a respondent from a loss on appeal (*see* CPLR 5501 [a] [1] ["including any . . . on that appeal"]), whereas the majority dispenses with that requirement entirely.

The majority evades the "fundamental[]" principle of our jurisprudence barring affirmative relief to nonappealing parties in most cases (*Nash v Port Auth. of New York and New Jersey*, 22 NY3d 220, 227 [2013, Graffeo, J., dissenting]) by explaining the Appellate Division's remittal was "corrective action" (majority op at 5) that did not grant the People affirmative relief. In the majority's telling, the Appellate Division's immaculate correction was begat by neither party, benefitted neither party, and corrected nothing about County Court's order.

In fact, the remittal's origins and effect were quite quotidian. The People, not Mr. Weber, asked the Appellate Division for a remittal, because they conceded that their points-based level-three determination was flawed and they needed a do-over to secure a level-three adjudication (*see* Black's Law Dictionary 1544 [11th ed 2019] [defining relief as "(t)he redress or benefit . . . that a party asks of a court"]). Because it allowed them to win a new County Court order nullifying the previous one, the remittal affirmatively relieved the People of the burden of the now-reversed County Court decision, from which the People did not and could not appeal. The majority's holding depends on its conclusion that remittal to permit the People to pursue a legal theory they could have pursued originally,

but did not, grants the People no relief. I doubt even the People would subscribe to that proposition (and, indeed, it is not an argument made at any point in this litigation).

## **IV.**

The majority opinion has a difficult job: it must rationalize a departure from universally applied civil procedure rules preventing do-overs on the basis of alternative grounds for relief that could have been asserted in the court of instance while denying that it has done so here. Our legal system derives its legitimacy in large part from its commitment to consistent rules—particularly those that constrain the decision-making of government officials wielding state power over individuals. Mr. Weber might wonder whether our rules have done so here.

Order appealed from and Appellate Division order brought up for review affirmed, without costs. Opinion by Judge Halligan. Judges Rivera, Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion. Judge Troutman took no part.

Decided June 15, 2023